**Felix Hilario SECAIDA–ROSALES,**
Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,**
Respondent.

**Docket No. 01–4109.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 2002.

Decided June 2, 2003.

Anne Pilsbury, Brooklyn, NY (Lisa Reiner–Sotelo and Central American Legal Assistance, of counsel), for Petitioner.

Michael M. Krauss, Assistant United States Attorney, New York, NY (James B. Comey, United States Attorney, Kathy S. Marks, Gideon A. Schor and Megan Brackeny, Assistant United States Attorneys, of counsel), for Respondent.

Before OAKES, CABRANES and KATZMANN, Circuit Judges.

Judge JOSÉ A. CABRANES dissents in a separate opinion.

OAKES, Senior Circuit Judge.

Petitioner Felix Hilario Secaida–Rosales appeals from the decision of the Board of Immigration Appeals ("BIA") affirming the denial of his petition for asylum and withholding of deportation by an Immigration Judge ("IJ"). He argues that the IJ erred as a matter of law by relying on a number of improper grounds and by holding him to inappropriately high evidentiary standards when she made an adverse credibility finding with regard to him, and that, absent these errors, grounds for an adverse credibility finding are completely lacking in the record. Because we agree, we reverse the decision of the BIA with instructions to remand to the IJ. We order a remand for the limited purpose of providing the IJ an opportunity to take additional evidence on and address the question whether conditions in Secaida's country of origin have improved in the time since his application, such that a threat of persecution no longer exists.

## Background

Felix Hilario Secaida–Rosales was detained in September 1995 after he entered California without a visa. Faced with deportation proceedings, he filed an application for asylum and withholding of deportation. At the close of a two-day hearing, the IJ denied his request from the bench, issuing an oral decision in March 1996. He then appealed to the BIA, which, following a roughly five-year delay, summarily affirmed the decision of the IJ in a two-page decision issued May 30, 2001.

Secaida's testimony and documentary evidence before the IJ, as well as Secaida's asylum application, detailed the following about his personal history. Secaida was born and raised in the Canalitos neighborhood of Guatemala City, the capital of Guatemala. At the time he fled Guatemala in 1995, Secaida was twenty-seven years old. Secaida's family had lived in Canalitos for at least three generations. He attended school in Canalitos until he entered the University of San Carlos, Guatemala's only public university, in 1991. In the late eighties, Secaida secured employment working for the municipal gov-

ernment, starting as a cleaning person and eventually working full-time in a department that oversaw property matters in the city, both public and private. His last position was in the division that constructed and maintained the city roads.

According to his testimony and asylum application, the following incidents caused him to flee Guatemala and come to this country. Although Canalitos was a residential neighborhood, the residents did not hold individual title to the land they occupied. Rather, the land had been given to the residents of Canalitos and the city collectively in a royal land grant. Members of the neighborhood became concerned that the city would seize the land in an effort to meet its water needs, and they would lose their homes. They were worried in part because the government had a history of divesting individuals of their land, and had recently done so in another neighborhood in the capital.

Residents of Canalitos formed a committee in 1987, as provided for under Guatemala's law, to address the situation. The committee met regularly, and arranged several meetings directly with the mayor of Guatemala City. Secaida's uncle, Jose Maria Rodriguez–Munoz, was the president of the committee from its inception. The committee sought to secure title to the neighborhood property for the residents of Canalitos individually, which consisted of roughly 2,000 families.

Because of his position with the municipal government, Secaida was in a position to help the committee. The property department in which he worked held the land records for the city. When the committee was formed, Secaida was working in a division of the property department that inventoried all the municipal governmental property. As a result, he was privy to files containing the land records for Canalitos. A short time after the formation of

the neighborhood committee, a new file on Canalitos was started in the department. One of the documents sent to the file in this time period was a document purporting to change the title to the lands in Canalitos so that they were held solely by the municipality of Guatemala (Guatemala City). The residents of Canalitos had not been informed of the change. Once he uncovered documents that he felt confirmed the rumors that the government was trying to take the land in Canalitos away from the residents, Secaida told his uncle and the rest of the committee about the title change.

Eventually, sometime toward the end of 1989, once the new file was completed, Secaida tried to photocopy it for the committee. Unfortunately, his supervisor caught him doing so and became very upset with him. Secaida was concerned about being caught because, during one of the meetings with the committee, the mayor himself had questioned where the committee was getting its information about the government's actions regarding the neighborhood. As noted by Secaida in his testimony, para-military death squads were active in Guatemala during this time, and were often employed by government officials to intimidate the opposition in political disputes. Nevertheless, Secaida's uncle and the committee continued their efforts to secure title to the land in Canalitos.

In April 1992, Secaida's uncle was shot to death while he tended his store in Canalitos. A gunman simply entered the store, shot Secaida's uncle four times and exited. Secaida was outside the store at the time it happened, speaking with one of his cousins. Secaida heard the shots and saw the gunman as he left. He immediately recognized the man as Byron Ismael Pineda, who also resided in Canalitos. Secaida knew Pineda because Secaida's father had

left Secaida's mother when he was very young and had lived with Pineda's mother for a time.

Secaida followed Pineda. As he fled to a waiting car, Pineda realized that Secaida was following him, and he fired two shots at Secaida. Secaida then returned to his uncle's store and accompanied him in the ambulance to the hospital. His uncle died later that same day. Secaida provided a copy of the death certificate at his hearing.

Secaida and his family did not report the murder to the police because they suspected that Pineda was working on behalf of the death squads. In late 1991 before his death, Secaida's uncle had told Secaida that he had received threats from two other individuals—Jose Felipe Ramos–Lopez and Jose Abram Calderon–Ovando—because of his work on behalf of the Canalitos neighborhood, and that Secaida should be careful himself. As the background materials submitted by Secaida point out, members of the death squads and similar unofficial security forces enjoyed impunity for their actions. As one news article noted, "police and military officials were literally getting away with murder, often of Guatemalans involved in human rights work." Howard LaFranchi, *Laggard Guatemala Tries an Election, But Winners May be Military, Mafia,* Christian Sci. Monitor, Nov. 9, 1995. Both the UN mission to Guatemala and Guatemala's human rights ombudsman's office cited impunity for such activity as the principal obstacle to respect for human rights. *Ombudsman: Persistent Violations and Impunity,* Cent. Am. Newspak Vol. 10, No. 18, Oct. 2–15, 1995, at 5 (Human Rights Documentation Exchange). A report issued by Human Rights Watch noted that "a sort of underground system regularly meted out retaliation against those who pursued justice through the courts.... [W]itnesses, plaintiffs, and relatives of victims of human rights violations [were] targeted for violence and intimidation." Human Rights Watch, Human Rights Watch World Report 1996, Events of 1995, at 95 (1996).

Secaida felt his suspicions that Pineda was affiliated with the death squads were later confirmed by news articles from early 1994 implicating Pineda, Lopez and Ovando in the July 1993 kidnapping and extortion of a Guatemalan woman married to a journalist for a U.S. paper. The victim lived in the Canalitos neighborhood. He provided copies of the articles at his hearing. The articles noted that both Lopez and Ovando held positions with the Criminal Investigations Unit of the National Police. Secaida observed that only a month after their apprehension for the crimes, all three men were released from jail. Additionally, Secaida's other uncle, brother to Jose Maria Rodriguez–Munoz, worked for the courts in Guatemala and had confirmed that all three men had criminal records.

Secaida became concerned for his own safety after his uncle's death because he had been present, and of the people present, he was the only individual who had recognized Pineda at the time of the shooting. Furthermore, a little over a year after the shooting, Pineda requested, through a third party, a meeting with Secaida to discuss the land situation in Canalitos. Secaida thought better of attending and never went. In the ensuing time, Secaida received threats from Pineda, roughly four in total. Secaida noted in his application that on one occasion Pineda approached him as he was boarding a city bus and said that he would be the next to be killed because he was the only one who knew that it was Pineda who killed his uncle. Despite the threats, Secaida contacted a lawyer about reviving the neighborhood committee, which had died out

following his uncle's assassination. At least one of the threats from Pineda came in 1994 after Secaida tried to revive the activities of the committee. Pineda told Secaida to watch out if he "had fear of what happened to [his] uncle."

On July 30, 1994, Secaida was hit by a car as he walked from a restaurant where he had just had dinner. He suffered severe injuries including a broken pelvis, perforated bladder, the loss of a portion of his intestine, and a head injury. He testified that he believed the car hit him intentionally because of the circumstances. The incident occurred at night when there were no other cars on the streets, and Secaida stated that he saw the car turn on its lights in its parked position as he left the restaurant. As he crossed the street a short distance from the restaurant, the car struck him. He said it could not have been a mere accident. As a result of his injuries, he had two additional surgeries following his original hospitalization. Secaida provided the court with documents indicating disability leave from his job during this time. He stated he had been in very poor health as a result of the accident.

Several months later, in March 1995, Secaida received a written threat at his home. The letter stated that Secaida would not be so lucky a second time and made reference to the car "failing." Because of these references, Secaida assumed it came from the same person who had hit him with the car, although the signature on the threat was indecipherable. In this same time period, Secaida had also seen Ovando at the municipal offices where Secaida worked following his return from disability leave. On one occasion in the early summer of 1995, Ovando followed Secaida and a municipal driver as they left the office on business. After a lengthy drive through the capital, the driver was able to eventually evade Ovando. Secaida thereafter decided he should move from his mother's house and live with a friend.

Shortly after moving to his friend's house, he had another encounter with Ovando, as well as Lopez, on a visit to his mother's in July 1995. His mother asked him to go to the store, and when he opened the front door Ovando and Lopez were standing there on the doorstep. He immediately closed the door and remained inside the rest of the night. Ovando and Lopez stayed outside his mother's house for several hours. After they were gone, Secaida left in the early morning hours. He testified that was the last time he returned to his mother's house before fleeing the country. After the incident he moved again, this time to the house of a couple with whom he was friendly and who lived in a different part of Guatemala City.

In early August of 1995, Secaida had an encounter that convinced him to leave Guatemala. He had gone to the store to buy cigarettes. While there, a police officer entered the store and, according to Secaida, purposefully spilled a soft drink on him. He then confronted Secaida and said he had to pay for it. Although Secaida was willing to, the officer called other officers into the store and they handcuffed Secaida. As they took him outside to a patrol car, Secaida's friends interceded. The police said that Secaida was wanted for many reasons and they were simply following orders. After a further exchange, Secaida's friends managed to secure his release in exchange for money. The police told Secaida's friends that they were under orders to kill him, but were willing to let him go for payment. Secaida stated that these events convinced him that he should fear for his life.

Secaida decided that he had to leave Guatemala. In early September, he secured a new national identity card and

then fled to the United States where he was detained as noted above.

As additional matters potentially relevant to his claims, Secaida also noted on his asylum application that, as a student, he had been an active participant in the student association that organized the annual "Huelga de Dolores," or "Strike of Sorrows," in which students air their grievances against the government. He participated in the strikes in 1991, 1992 and 1993. At his hearing, he noted that he was present on the evening in 1992 when the military opened fire on the group of students getting ready for the next day's strike, killing a classmate and friend of his. The incident was widely reported and condemned by the Guatemalan press, as noted by background materials provided by Secaida. He also noted his membership in the political party known as the Union del Centro Nacional ("UCN"), whose leader was assassinated in 1993, and his participation in meetings and activities organized by the party.

Citing these affiliations, and the events described above, Secaida sought either asylum or withholding of deportation. Following the two-day hearing described above, the IJ concluded that she did not find Secaida at all credible and discounted the entirety of his relevant testimony, despite the corroborating documentary evidence he offered. After a delay of five years, the BIA affirmed the decision, concurring with the reasons given by the IJ for the adverse credibility determination, and gave Secaida thirty days to voluntarily depart the United States. He now petitions this court for relief.

*Discussion*

■■■■ Ordinarily we review the BIA's decision, not the decision of the IJ, on appeal to this court.[1] *See, e.g., Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir.2002) (per curiam); *Diallo v. INS*, 232 F.3d 279, 285–87 (2d Cir.2000). We note here, however, that the IJ issued a thirty-page oral decision in this case, whereas the BIA decision comprises less than two pages, with its discussion of the substance of Secaida's appeal confined to two paragraphs which primarily recount the IJ's reasoning. The BIA is certainly not precluded from summarily affirming an IJ's decision and adopting the IJ's reasoning in doing so, as long as the IJ's decision is sufficient to allow for review and we are confident that the BIA fulfilled its duty to independently review a petitioner's case. *See Felzcerek v. INS*, 75 F.3d 112, 118 (2d Cir.1996); *Arango–Aradondo v. INS*, 13 F.3d 610, 613 (2d Cir.1994); *see also Chen v. INS*, 87 F.3d 5, 7–8 (1st Cir.1996); *Panrit v. INS*, 19 F.3d 544, 545–46 (10th Cir.1994). But it is appropriate in such circumstances to review the decision of the IJ directly. *See Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir.2002); *Pop v. INS*, 270 F.3d 527, 529 (7th Cir.2001). Furthermore, as in our sister circuits, our review will be confined to the reasoning of the IJ, and we will not search the record independently for a basis to affirm the BIA. *See Gandarillas–Zambrana v. BIA*, 44 F.3d 1251, 1255 (4th Cir.1995); *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir.1995); *Panrit*, 19 F.3d at 546. Accordingly, if the IJ's reasoning proves inadequate for denying a petitioner's claim, we will not hesitate to reverse.

---

1. We have jurisdiction to hear Secaida's appeal under the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104–208, § 309(c)(1), 110 Stat. 3009, 3009–546, 3009–625, which preserved jurisdiction under

8 U.S.C. § 1105a(a) (repealed 1996) in cases such as these where deportation proceedings were initiated prior to April 1, 1997, and the BIA issued its final order of deportation after October 30, 1996. *See Diallo v. INS*, 232 F.3d 279, 282 n. 1 (2d Cir.2000).

*See Gandarillas–Zambrana,* 44 F.3d at 1251; *Panrit,* 19 F.3d at 546.

## I. *The Governing Law*

Secaida applied for both asylum under § 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158(a) (1995) (amended 1996, current version at 8 U.S.C. § 1158(b)(1) (2002)), and withholding of deportation under § 243(h) of the INA, 8 U.S.C. § 1253(h) (1995) (amended 1996, current version at 8 U.S.C. § 1231(b)(3)(A) (2002)). The grounds supporting such claims are related and often rely on the same matters of proof. *See Alvarado–Carillo v. INS,* 251 F.3d 44, 50 (2d Cir. 2001); *Osorio v. INS,* 18 F.3d 1017, 1021 (2d Cir.1994).

 As a general matter, the governing statutes give the Attorney General discretion to grant asylum to an applicant who demonstrates persecution or a well-founded fear of persecution based on political opinion, while they *require* him to withhold deportation where an applicant's life or freedom would be threatened for that reason. *See INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 353–54, 154 L.Ed.2d 272 (2002) (per curiam). Relative to asylum, "[a]n alien's fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo,* 232 F.3d at 284. With respect to withholding of deportation, however, the applicant must make a showing that there is a "clear probability" of a threat to life or freedom on account of political opinion—a higher burden than that for a claim of asylum. *Alvarado–Carillo,* 251 F.3d at 50; *Diallo,* 232 F.3d at 284–85. If the applicant shows that he or she has suffered past persecution such that the applicant's life or freedom was threatened, a rebuttable pre-sumption arises that there is a clear probability of a future threat should the applicant be returned. *See Alvarado–Carillo,* 251 F.3d at 50. Similarly, if an applicant shows that he or she has been the subject of past persecution based on political opinion, a rebuttable presumption arises that the applicant has a well-founded fear of persecution such that he or she would be eligible for asylum. *Id.* Both of these presumptions may be rebutted by a showing that conditions in the country of origin have changed to the degree that the danger no longer exists. *Qiu v. Ashcroft,* 329 F.3d 140, 147–48 (2d Cir.2003); *Diallo,* 232 F.3d at 285.

 With regard to the proceedings themselves, the petitioner bears the burden of demonstrating eligibility for either asylum or withholding of deportation. *See Osorio,* 18 F.3d at 1021–22. Recognizing the difficulties of proof in such cases, the "strict rules of evidence do not apply in deportation proceedings."[2] *Felzcerek,* 75 F.3d at 116. Furthermore, a petitioner's testimony alone may be sufficient to carry this burden. *See Diallo,* 232 F.3d at 286 (citing 8 C.F.R. §§ 208.13(a), 208.16(b)). Relatedly, the IJ has an affirmative obligation to help establish and develop the record in the course of such proceedings. *See Yang,* 277 F.3d at 162. *But see Qiu,* 329 F.3d at 155–56 & n. 17 (noting that this court has not explicitly defined an IJ's duty to help develop the record when an applicant has the assistance of counsel, or the remedy for failure to do so, but declining to reach question).

## II. *Our Standard of Review*

 When a decision of the BIA, or that of an IJ, is before this court on ap-

---

**2.** The Rules of Evidence may nevertheless guide an IJ regarding the presentation of evidence so as to ensure that a petitioner is afforded due process in the course of the proceedings. *Felzcerek,* 75 F.3d at 116.

peal, we review factual findings under the substantial evidence standard. *See Alvarado–Carillo,* 251 F.3d at 49. Under this standard, a finding will stand if it is supported by "reasonable, substantial, and probative" evidence in the record when considered as a whole. *Diallo,* 232 F.3d at 287 (internal quotation omitted); *see also Qiu,* 329 F.3d at 148–49 (noting substantial evidence standard is slightly stricter than review for clear error). As we noted in *Diallo,* however, "when review involves mixed questions of law and fact, the standard of review is far less deferential." 232 F.3d at 287. Thus, if the issue on appeal involves the proper application of legal principles to the facts and circumstances of the individual case at hand, our review has been *de novo. Qiu,* 329 F.3d 140, 2003 WL 1878901, at *7; *Alvarado–Carillo,* 251 F.3d at 49; *Diallo,* 232 F.3d at 287.

 Generally, courts have treated credibility questions in deportation proceedings as questions of fact subject to the substantial evidence standard. *See, e.g., Gao,* 299 F.3d at 272; *Ahmad v. INS,* 163 F.3d 457, 461 (7th Cir.1999); *Cordero–Trejo v. INS,* 40 F.3d 482, 487 (1st Cir.1994); *Aguilera–Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir.1990). But at least one court has noted that "credibility findings resting on analysis of testimony rather than on demeanor may deserve less than usual deference." *Cordero–Trejo,* 40 F.3d at 487 (internal quotation omitted). Therefore, when a credibility determination analyzing testimony is based on flawed reasoning, it will not satisfy the substantial evidence standard. *See Aguilera–Cota,* 914 F.2d at 1381. In contrast, using an inappropriately stringent standard when evaluating an applicant's testimony constitutes *legal,* not factual, error. *Id.* at 1380. Accordingly, we have not hesitated to vacate decisions of the BIA when they are the result of the application of improper legal standards to

the evaluation of the weight to be accorded an applicant's testimony. *See, e.g., Alvarado–Carillo,* 251 F.3d at 50.

 Specifically, when a case, like this one, rises and falls purely on an IJ's credibility finding, courts have been particularly concerned that the decision-maker carefully detail the reasoning leading to the adverse finding. *See Ahmad,* 163 F.3d at 461; *Senathirajah v. INS,* 157 F.3d 210, 216 (3d Cir.1998); *Aguilera–Cota,* 914 F.2d at 1381. An IJ cannot completely insulate her decision from review simply by dismissing all of an applicant's testimony on credibility grounds. *See Metzen v. United States,* 19 F.3d 795, 798 (2d Cir. 1994). As the Ninth Circuit has noted, "[t]he fact that an IJ considers a petitioner not to be credible constitutes the beginning not the end of our inquiry." *Aguilera–Cota,* 914 F.2d at 1381.

 When an IJ rejects an applicant's testimony, the IJ must provide "specific, cogent" reasons for doing so. *Id.; see also Ahmad,* 163 F.3d at 461; *Senathirajah,* 157 F.3d at 216. Those reasons must bear a legitimate nexus to the finding, *see Ahmad,* 163 F.3d at 461; *Senathirajah,* 157 F.3d at 216, and must be "valid grounds" for disregarding an applicant's testimony. *See Senathirajah,* 157 F.3d at 216; *Aguilera–Cota,* 914 F.2d at 1381. "Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible." *Gao,* 299 F.3d at 272. As the Ninth Circuit has aptly observed, "[i]n cases of this nature, where the principal and frequently only source of evidence is the petitioner's testimony, it is particularly important that the credibility determination be based on *appropriate* factors." *Aguilera–Cota,* 914 F.2d at 1381 (emphasis added). With these principles in mind, we turn to the IJ's decision in this case.

III. *The IJ's Decision*

In her oral decision, the IJ listed several reasons for her adverse finding. Primarily, she noted the omission of two facts from Secaida's application to which he then testified in the course of the hearing. The IJ also pointed to the implausibility of Secaida's safely continuing employment and procuring a new national identity card while subject to persecution, his failure to produce additional corroborating evidence above and beyond what he already did supply, and his confusion in response to several questions on cross-examination, as reasons for rejecting his testimony.

▮ An applicant's failure to list in his or her initial application facts that emerge later in testimony will not automatically provide a sufficient basis for an adverse credibility finding. "Inconsistencies of less than substantial importance for which a plausible explanation is offered cannot form the sole basis for an adverse credibility finding." *Campos–Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir.1999) (internal quotation and alteration omitted). This is especially so when the inconsistencies do not concern the basis for the claim of asylum or withholding, but rather matters collateral or ancillary to the claim. *Gao*, 299 F.3d at 272 (holding that minor discrepancies that do not "involve the heart of the asylum claim" are not an adequate basis for an adverse credibility finding); *Diallo*, 232 F.3d at 288 (holding that minor and isolated disparities in testimony need not be fatal to credibility, especially when they do not concern material facts). Like outright inconsistencies, the impact of omissions must be measured against the whole record before they may justify an adverse credibility determination. *See Aguilera–Cota*, 914 F.2d at 1382 ("If minor inconsistencies or misrepresentations of unimportant facts cannot constitute the basis for an adverse credibility

finding, *a fortiori* minor omissions cannot.").

▮ When measuring whether an omission is "substantial," we take note of the fact that the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and that holding applicants to such a standard is not only unrealistic but also unfair. *See Aguilera–Cota*, 914 F.2d at 1382–83 ("A failure to state each and every ground for a claim of political asylum at the time of the initial application should not prejudice that claim, and particularly not where the petitioner subsequently provides documentation to support his testimony."). For example, the form utilized by the INS for applications for asylum and withholding provides half a page for the applicant to explain why he or she is seeking asylum, and no more than two inches to recount mistreatment or threats against the applicant or the applicant's family by the government or other groups. Although the application invites the applicant to attach additional pages, we think the small space on the form itself would hardly indicate to an applicant that the failure to include every detail regarding the basis for asylum could later lead to an adverse credibility finding when the applicant elaborates on them in the course of a deportation hearing. *See Pop*, 270 F.3d at 531–32 ("We hesitate to find that one seeking asylum must state in his or her application every incident of persecution lest the applicant have his or her credibility questioned if the incident is later elicited in direct testimony.").

▮ The first omission cited by the IJ consists of Secaida's failure to include in his written application the detail that Pineda shot at him when Secaida followed Pineda after his uncle's assassination. As

a preliminary matter, it is questionable whether this fact goes to the heart of Secaida's broader claim to asylum, which was based on a *series* of events—his involvement with the Canalitos committee, his uncle's assassination, the attempt on his life when he was hit by a car, and the repeated threats he received—spanning at least six, and maybe as many as eight, years. *Cf. Alvarado–Carillo*, 251 F.3d at 51–52 (noting minor inconsistencies in dates in testimony that concerned events spanning several years should not necessarily lead to an adverse credibility determination). Even if this omission was material, however, it was not substantial. Taken in light of what we have just said about measuring the substantiality of omissions from the initial application, and the extensive other evidence Secaida offered to demonstrate that he was in fact repeatedly threatened with death, we think his failure to mention one aspect of the story of his uncle's murder cannot suffice to render his testimony as a whole incredible.

Indeed, Secaida offered an explanation for the omission. Secaida stated that he had been scared and flustered by his recent arrest and impending deportation proceedings, and had probably simply forgotten to tell his non-attorney representative all the details of his experiences in Guatemala. The IJ rejected this explanation, saying she simply failed to see how he could have forgotten to include this part of the story—despite the intervening events of his own injuries and threats to his own life. In so doing, the IJ has held Secaida to an inappropriately exacting standard.

■ The second omission from the written application—Secaida's failure to note that a friend and classmate had been killed at the student strike at which Secaida noted his presence and at which Secaida *did* note that the military opened fire on the students—took place in Secaida's

response to a catch-all question regarding other affiliations that might bear on his claim for asylum. He noted his membership in the student organization that organizes the strike and as an aside noted the events of the 1992 strike. Notably, this occurred in the course of a list of associations that also included all of his government posts, his membership in a teacher organization, his membership in another student organization, and his membership in a political party, along with accompanying elaboration on each. Thus, the context of the answer itself indicates that the matter was collateral to the central basis for his claim of asylum—his Canalitos-related activities—and was not intended as an extensive discussion of the strike itself. Here again, the IJ was holding Secaida to an inappropriately high standard of completeness.

■ With respect to the implausibilities concerning Secaida's employment and identification card, the IJ relied on flawed reasoning that failed to take account of conditions in Guatemala as detailed in Secaida's background materials, and on a standard regarding documentation that is at odds with at least one later BIA decision. The IJ questioned the plausibility of the proposition that Secaida could continue to work at his municipal job without any attempts being made on his life there. But she failed to acknowledge the description of the situation in Guatemala found in the background materials, which indicated that groups like the death squads operate underground and in a shadow manner that avoids intersection with legitimate governmental institutions. *Cf. id.* at 278 (noting IJ's finding of implausibility was based on "his own unsupported opinion as to how an authoritarian government operates"); *see also Cordero–Trejo*, 40 F.3d at 488 (noting that Guatemalan death squads are "clandestine").

Likewise, Secaida's ability to procure a new national identity card, which in Secaida's description was a strictly ministerial transaction, is not at odds with the possibility that he faced a threat from *extra-governmental* forces. *See id.* at 490 (observing that the "ability to obtain a passport does not necessarily indicate absence of persecution"). Moreover, the fact that the IJ weighed Secaida's *procurement* of a national identity card prior to fleeing Guatemala against his credibility appears to be at odds with the BIA's subsequent decision in *In re M–D*, 21 I. & N. Dec. 1180, 1998 WL 127881 (BIA March 13, 1998), recommending that applicants *provide* documentation of matters such as national identity whenever available, and drawing a negative inference from the *absence* of such documentation. *Id.* at 1182–83, 1184. Although this recommendation came in a case that we later vacated on appeal in *Diallo*, 232 F.3d at 290,[3] we found the BIA's general requirements regarding corroboration proper, but concluded it had simply misapplied them in that particular case. *Id.*

Reasoning similar to that of the IJ in this instance has also been rejected by at least one of our sister circuits. *Turcios v. INS*, 821 F.2d 1396, 1401–02 (9th Cir.1987) (characterizing IJ's reasoning as flawed when IJ found it implausible that petitioner could be threatened with persecution despite safely remaining in the country for several months and procuring both a passport and national identity card shortly before fleeing). As the First Circuit has observed, "to infer that an asylum applicant is unlikely to be persecuted because he ... w[as] not killed during attempts to terrorize [him] leads to the absurd result of denying asylum to those who have actually experienced persecution and were fortunate enough to survive." *Cordero–Trejo*, 40 F.3d at 489 (internal quotation omitted). The IJ's reasoning here leads to just such a result, and, further, is at odds with the record evidence regarding conditions in Guatemala. Consequently, Secaida's continued employment and possession of a new identity card do not form a valid, cogent reason for a negative credibility finding.

■■■ As noted above, the IJ also faulted Secaida for not providing corroborating evidence in addition to that which he did provide, and for not providing corroborating evidence of a better quality. In addition to his background materials and contemporaneous news articles from Guatemala, Secaida provided the following specific corroborating evidence: (1) his national identity card giving the names of his parents, his date of birth and his residence, listed as Canalitos; (2) his identification card from San Carlos University confirming his student status; (3) a copy of his uncle's death certificate indicating the cause of death as bullet wounds to the neck;[4] (4) a copy of the paperwork in support of his medical leave from work following his accident in July 1994; and (5) the written threat he received at his mother's home.

---

**3.** The Ninth Circuit Court of Appeals has explicitly disapproved of the corroboration requirements enunciated in *In re M–D–*, to the degree that they conflict with that circuit's precedent. *Ladha v. INS*, 215 F.3d 889, 901 (9th Cir.2000).

**4.** Despite the fact, as noted above, that the Federal Rules of Evidence do not apply to proceedings such as these, and in the absence of any objection from the INS attorney, the IJ criticized the failure of Secaida's non-attorney representative to establish a proper chain of custody for the death certificate, but ultimately allowed its admission following questioning by the representative on that point.

When questioned by the IJ about why he did not have the direct medical records of his injuries, Secaida explained they were in Guatemala and had been submitted to his employer in support of his disability leave. Without explaining why, the IJ concluded that this explanation was simply inadequate. Furthermore, despite Secaida's testimony that he was currently living in a shelter in New York and his lack of proficiency in the English language, and without citation to authority from either the BIA, or any court, for the requirement, the IJ suggested that Secaida should have procured corroborating medical evidence of his injuries from a doctor in the United States. Again, holding Secaida to this requirement is above and beyond anything required by case law or INS regulations, which, as noted above, state that testimony *alone* may be enough to substantiate a claim to asylum or withholding. Furthermore, nothing in the record suggests that such evidence was readily obtainable by Secaida. *Cf. Diallo*, 232 F.3d at 289 (noting BIA failed to explain why *additional* corroboration should have been easily accessible to applicant); *see also Qiu*, 329 F.3d at 153–54 ("Unless the BIA anchors its demands for corroboration to evidence which indicates what the petitioner can reasonably be expected to provide, there is a serious risk that unreasonable demands will inadvertently be made.... What is (subjectively) natural to demand may not ... be (objectively) reasonable.").

With regard to his uncle's death certificate, the IJ faulted Secaida for the failure to provide any evidence beyond his own testimony that the man named on the death certificate was in fact his uncle. As a preliminary matter, the individual on the death certificate shares a surname with Secaida's mother as she is listed on his national identity card, which does substantiate Secaida's claim to some degree. But, more importantly, the IJ fails to point to anything in the record to support her alternate conclusion that Secaida is wholly unrelated to the individual listed on the death certificate, a copy of which he nevertheless had in his possession. As we stressed above, an IJ must point to valid reasons for rejecting an applicant's testimony, and an adverse credibility determination should not be based on speculation or conjecture. *See Gao*, 299 F.3d at 272; *Senathirajah*, 157 F.3d at 216.

The IJ also rejected the death threat in a similar fashion. She noted that the letter makes no reference to the basis or source of the threat and concluded that "[i]t could as easily be ... due to a love dispute." This not only constitutes further conjecture, but, as another court has observed, persecutors are hardly "given adequate notice that our government expects them to sign their names and reveal their individual identities when they deliver threatening messages." *Aguilera–Cota*, 914 F.2d at 1380 (noting they are also unlikely to provide affidavits attesting to acts of persecution); *see also Ladha v. INS*, 215 F.3d 889, 905 n. 17 (9th Cir.2000) (excluding documents simply because they are "self-serving" is not a sound practice). Concluding that *persecutors'* failure to reveal their identities and motivations in writing undercuts an *applicant's* credibility does not rest on the "legitimate nexus" required in credibility findings.

As with Secaida's omissions on his applications, the IJ applied too stringent a standard to his corroborating evidence. We do not believe such treatment was warranted under the law. *See Sidhu v. INS*, 220 F.3d 1085, 1091 (9th Cir.2000) (noting only the absence of material and *non-duplicative* corroborating evidence should form basis of adverse determination and stating "where an applicant produces credible corroborating evidence to buttress an aspect of his own testimony, an IJ may not base

an adverse credibility determination on the applicant's failure to produce *additional* evidence that would further support that particular claim") (emphasis added).

■ As for Secaida's confusion in the face of cross-examination by the IJ and the INS attorney, it amounts to no more than three isolated instances of Secaida asking for questions from the IJ to be repeated. Furthermore, rather than Secaida struggling only to answer the IJ's questions, the record reflects that Secaida struggled with the language barrier throughout questioning by his *own* representative. By this court's count, Secaida became confused and had to ask for either a clarification or repetition of his *own* representative's questions on at least eight occasions over the course of the two-day hearing. Thus, the record does not reflect obfuscation by Secaida only when subject to hostile questioning as the IJ suggests.

In sum, the IJ relied on a number of inappropriate standards with regard to Secaida's testimony and corroboration, and erroneously resorted to speculation and conjecture when assessing the evidence in support of his claim for asylum and withholding. These factors converged to result in credibility determination that, upon review, is neither based on valid, cogent reasons nor is supported by substantial, probative evidence in the record. As noted above, the only omission of fact that was arguably material to the basis for Secaida's claim of asylum and withholding concerned the shots fired in the chase following his uncle's assassination. But in the context of the whole record, it amounts to no more than a minor and isolated disparity that could not lead a reasonable fact-finder to dismiss the entirety of Secaida's testimony. Thus, the IJ has failed to point to any valid basis or substantial evidence in the record that would support an adverse credibility determination. Accordingly, we reverse the negative finding. *Cf. Senathirajah*, 157 F.3d at 218, 222; *Aguilera–Cota*, 914 F.2d at 1383.

The question, then, is what is the appropriate next step in this case. We asked the parties for supplemental submissions on this question, as well as the question to what degree our decision in *Osorio*, 18 F.3d 1017, should control the outcome. As both parties have noted, *Osorio* presented a somewhat different case from this one, as the applicant's credibility was not at issue. *Id.* at 1022. Rather, the *Osorio* court was confronted with the question whether, as a matter of law, the applicant had been subject to political persecution. *Id.* at 1023. Because the BIA had erred when concluding the events described by the applicant did not amount to political persecution, we reversed and held, as a matter of law, that the applicant qualified for asylum and was also entitled to withholding of deportation based on that persecution. *Id.* at 1023, 1031–32. Remand was not necessary for further factual development, as the predicate facts were not disputed.

■ In contrast, the IJ here never reached the legal or factual questions of eligibility for either asylum or withholding *in light of current country conditions* because she simply rejected all of Secaida's testimony regarding the events in Guatemala he claimed led to his flight. Furthermore, a *substantial* amount of time has passed since the IJ assessed Secaida's application.[5] Given our above conclusion

---

5. This is in no way attributable to Secaida, who had no control over the fact that the BIA took over five years to reach a decision in his case. Nevertheless, the practicalities of the asylum process dictate that remand occur to assess any potential change in country conditions. *Cf. Yang*, 277 F.3d at 162 (noting the "recurring problem of the significant time

that the IJ erred by rejecting Secaida's testimony, it appears remand is necessary in this case to allow the IJ to reach the secondary question of country conditions. *See Ventura,* 123 S.Ct. at 355–56 (holding that appellate court erred by reaching question of changed country conditions where neither BIA nor IJ had been given a chance to address it in the first instance). As we noted in *Yang,* however, while Secaida bears the burden of proof, a burden of production rests with the INS as the party with greater access to information regarding current country conditions. 277 F.3d at 163. Thus, on remand the IJ should give the INS the opportunity to update the record on conditions in Guatemala beyond the background materials already provided by Secaida, should it wish to do so. The IJ should then reach the questions of asylum and withholding of deportation in light of such evidence, but without regard to its prior adverse credibility determination. *Cf. Senathirajah,* 157 F.3d at 222 (remanding to BIA with instructions to remand to IJ for decision on asylum and withholding application, but without consideration of erroneous adverse credibility finding reversed on appeal).

### Conclusion

Because the IJ's adverse credibility finding was based on erroneously stringent standards and was not supported by substantial evidence in the record, we reverse the BIA's decision affirming the determination. We remand to the BIA with instructions to remand to the IJ so additional evidence may be taken on the question of current conditions in Guatemala and so that the IJ can evaluate Secaida's application in light of such evidence in the first instance.

gaps between operative events, [BIA] determi-

JOSÉ A. CABRANES, Circuit Judge, dissenting.

I respectfully dissent. Based on the record as a whole, I believe that a reasonable fact-finder could have declined to credit Secaida's testimony and, therefore, substantial evidence supports the denial of Secaida's application for asylum and for withholding of removal.

When considering a petition for review of a deportation order, the scope of our inquiry is "exceedingly narrow." *Melgar de Torres v. Reno,* 191 F.3d 307, 313 (2d Cir.1999). We accept the immigration court's factual determinations as long as they are supported by substantial evidence in the record, giving particular deference to credibility determinations, *see Montero v. INS,* 124 F.3d 381, 386 (2d Cir.1997), and "[w]e reverse only if no reasonable fact-finder could have failed to find the past persecution or fear of future persecution necessary to sustain the petitioner's burden," *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000). In other words, "[w]e review the IJ's and BIA's credibility findings for substantial evidence and, thus, must uphold the findings unless the evidence presented compels a reasonable factfinder to reach a contrary result." *De Leon–Barrios v. INS,* 116 F.3d 391, 393 (9th Cir.1997).

In view of this legal standard, I believe the majority errs in reversing the IJ's credibility determination. Specifically, I believe that a reasonable fact-finder could conclude that Secaida was not credible on the ground that his asylum application failed to mention a central aspect of his trial testimony—namely, that Pineda shot at him. The majority admits that this omission from Secaida's asylum application was "arguably material to the basis for Secaida's claim of asylum and with-

nation, and appellate review'').

holding." Maj. Op., *ante,* at 312. In my view, this testimony is *clearly* material because it is the only direct evidence that any members of the death squad ever tried to kill Secaida. Although Secaida claims that the death squad attempted to assassinate him by hitting him with a car, he was not able to identify the driver of the automobile and provided no other basis for concluding that Pineda's death squad was responsible for this accident. And while Secaida allegedly received numerous death threats from Pineda, Secaida's testimony that Pineda shot at him is the only evidence indicating that Pineda had any intention of carrying out these asserted threats.

Because Secaida's testimony that Pineda shot at him greatly strengthens his claim for asylum, the IJ reasonably determined that the omission of this material evidence from Secaida's asylum application supported an inference that Secaida had fabricated his testimony at the hearing. The majority opinion reasons that this omission "cannot suffice to render [Secaida's] testimony as a whole incredible" because "Secaida offered an explanation for the omission":

> Secaida stated that he had been scared and flustered by his recent arrest and impending deportation proceedings, and had probably simply forgotten to tell his non-attorney representative all the details of his experiences in Guatemala. The IJ rejected this explanation, saying she simply failed to see how he could have forgotten to include this part of the story .... In so doing, the IJ has held Secaida to an inappropriately exacting standard.

Maj. Op., *ante,* at 309. It is not clear to me why the majority believes that the IJ "held Secaida to an inappropriately exacting standard" by declining to accept Secaida's explanation that he had "simply forgotten" to mention the fact that Pineda shot at him in preparing his asylum application. It was well within the IJ's discretion to reject this *ex post* explanation and, instead, conclude from the omission that Secaida's testimony was not credible. By overruling the IJ's credibility determination on this issue, the majority failed to give any deference, let alone *"particular deference,"* to the credibility determination of the IJ. *Montero,* 124 F.3d at 386 (emphasis added).

The majority holds that several of the other justifications given by the IJ for his adverse credibility determination were either invalid or lacked a substantial basis in the record. I agree with much of the majority's analysis and, had I been the fact-finder in this case, I might well have chosen to credit Secaida's testimony. Nevertheless, the standard of review is not *de novo:* "To reverse under the substantial evidence standard, 'we must find that the evidence not only *supports* that conclusion, but *compels* it.'" *Ahmed v. Ashcroft,* 286 F.3d 611, 612 (2d Cir.2002) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). In other words, as long as there exists a reasonable basis in the record for the adverse credibility determination, we are obligated to deny the petition for review. Because I believe that Secaida's omission from his asylum application of the fact that Pineda shot at him constitutes a reasonable basis for the IJ's adverse credibility determination, I would deny Secaida's petition for review.