**Tu LIN, Petitioner,**

v.

**Alberto R. GONZALES,\* Respondent.**

**Docket No. 03–40720.**

United States Court of Appeals, Second Circuit.

Argued: March 16, 2006.

Decided: April 27, 2006.

* Pursuant to Fed. R.App. P. 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as respondent in this case.

Fengling Liu, New York, NY, for Petitioner.

Ryan M. Archer, Special Assistant United States Attorney (Karin J. Immergut, United States Attorney for the District of Oregon, on the brief), Portland, OR, for Respondent.

Before: JACOBS, LEVAL, Circuit Judges, and RAKOFF, District Judge.**

JACOBS, Circuit Judge.

Petitioner Tu Lin ("Lin") appeals from the decision of the Board of Immigration Appeals ("BIA") affirming without opinion the order of Immigration Judge William F. Jankun ("IJ"), which (i) denied Lin's application for asylum under the Immigration and Nationality Act ("INA") and his applications for withholding of removal under the INA and the Convention Against Torture and (ii) ordered his removal to the People's Republic of China ("China"). Lin argues that the IJ's adverse credibility finding was unsupported by substantial evidence because it rested on grounds that were either immaterial or factually erroneous. The IJ did erroneously characterize certain portions of Lin's testimony as inconsistent; but we deny the petition because (i) the demeanor evidence and the discrepancies on which the IJ appropriately relied—when considered together—provide substantial evidence for the adverse credibility finding, and (ii) we are confident that the IJ would adhere to his decision, even absent his problematic findings.

## I

Tu Lin, a native of the Fujian province of China with a wife and two sons still living in China, entered the United States in April 2001—illegally and alone—seeking admission. Conceding removability, Lin filed his applications for asylum ("applica-

tion") and withholding of removal in October 2001, and he appeared in May 2002 before an IJ for a hearing on these applications.

Lin's application and hearing testimony, taken together, give the following narrative. Lin was married and had his first son in 1988; soon after, his wife suffered the insertion of an intrauterine device ("IUD") by Chinese family planning authorities. When the couple discovered that their son had congenital heart disease, they applied to Chinese authorities for permission to have a second child. The application was denied, but they decided to have the child in secret. When Lin's wife became pregnant in April 1990, Lin moved his family to Hunan; however, when Lin's wife was eight months pregnant, she returned to their home village in Fujian to obtain better medical care. Back home, Lin's wife hid from family planning authorities; but her second child was discovered within a month after birth. Family planning authorities wanted to sterilize Lin's wife, but because she was not physically able to undergo the procedure, they inserted an IUD and informed her that Lin would be sterilized instead.

Lin heard this news, and decided to remain in Hunan. In an effort to force him to submit to sterilization, family planning officials harassed his family, confiscating some of their appliances and damaging their home. Lin's wife fled from the damaged home to join Lin in Hunan, but authorities continued their harassment of Lin's family, including by detaining his mother for several days.

Lin's wife remained with Lin in Hunan into 1993, when her IUD fell out and she became pregnant with their third child.

** The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

Lin's wife's family in Fujian, unaware of her pregnancy, insisted that she return there to attend her brother's wedding; she made the trip in the sixth or seventh month of her pregnancy. While Lin's wife was home for the wedding, authorities discovered the pregnancy and performed a forced abortion on her, although her continuing health problems prevented sterilization.

Fearing intensification of the authorities' efforts to arrest him, Lin fled in 1994 from Hunan to the Guangxi Autonomous Region. He hid there until he left for the United States in 2001.

## II

At the conclusion of the May 2002 hearing, the IJ issued an oral opinion denying asylum and withholding of removal. The IJ's decision rested on an adverse credibility finding which, in turn, was based primarily on (i) numerous minor discrepancies between Lin's application and his testimony, and within his testimony itself; (ii) an inconsistency between the 1998 State Department Country Profile of China and Lin's testimony; and (iii) Lin's demeanor. The BIA affirmed the IJ's order without opinion.

## III

When the BIA affirms without opinion, we review the IJ's decision as the final agency determination. *See Twum v. INS*, 411 F.3d 54, 58 (2d Cir.2005). We review the IJ's factual findings under the substantial evidence standard, which is met "unless any reasonable adjudicator would be compelled to conclude to the contrary." § 1252(b)(4)(B); *see Ramsameachire v. Ashcroft*, 357 F.3d 169, 177 (2d Cir.2004); *see also Cao He Lin v. DOJ*, 428 F.3d 391, 401 (2d Cir.2005); *Zhou Yun Zhang v. INS*, 386 F.3d 66, 73 (2d Cir. 2004).

We typically afford "particular deference" to an IJ's credibility finding, "mindful that the law must entrust some official with responsibility to hear an applicant's asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." *Zhang*, 386 F.3d at 73 (internal quotation marks omitted). Our review of a credibility finding is essentially to ensure that it is "based upon neither a misstatement of the facts in the record nor bald speculation or caprice." *Id.* at 74; *see also Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003) (explaining that an adverse credibility finding must be based on "specific, cogent reasons" that "bear a legitimate nexus" to the applicant's credibility) (internal quotation marks omitted).

The IJ relied on three main grounds that we hold are together sufficient to support the adverse credibility finding:

(1) The IJ highlighted a number of discrepancies between Lin's application and his testimony and within his testimony itself. As the IJ explained:

> Respondent did not mention the incident with his father being slapped or his mother being detained. In addition, the respondent indicated that when his wife returned home for her second pregnancy, she hid at other houses. The respondent has not mentioned that today, but has just indicated that his wife's pregnancy was not discovered until after the baby was born, and the baby was crying. Also the respondent indicated it was more than 10 persons that came to the house to take his wife for the sterilization. Also, the respondent indicated that his house was destroyed when the authorities could not find him. The respondent today has not indicated that his house was destroyed at any time, but

only that a door and a window were taken. The respondent also indicated that after this, his wife brought their two sons to a reunion with him in Hunan. As the Court has indicated above, the respondent indicated his older son never left their home village because of his medical condition, and in fact, that had been his testimony. The respondent has not given any explanation as to why he states in his application that his two sons traveled with his wife to Hunan Province.

Also, the respondent indicated in his application that his two sons traveled with his wife back for her brother's marriage ceremony. Although as the Court has noted above, at one point today, the respondent indicated that one son traveled with her, and at another point, indicated that no family members traveled with her back for the marriage.

The record supports most of the omissions and inconsistencies relied on by the IJ.

Lin testified that after the birth of his second child, police officers "slapped" and "pushed" his father and detained his mother for several days. He failed to mention these incidents in his application.

Moreover, Lin's application and testimony differ, and his testimony itself is inconsistent, as to the number of his children who traveled with his wife on two separate occasions during the time period when he claims to have been hiding from Chinese authorities. Lin testified categorically that his sickly first child never left Lin's home village in Fujian. However, explaining the circumstances of a trip that Lin claims his wife took from Fujian to reunite with him in hiding in Hunan, Lin stated in his application that after family planning officials "destroyed" his house, his wife brought *both their sons* to Hunan because their house was uninhabitable. Lin direct-

ly contradicted this statement at the hearing, testifying that after the family planning officials "damaged" his house, his wife "went to Hunan to stay with me with *the second child.*" (emphasis added).

In his application, Lin stated that his wife and "our two sons" left Hunan to travel back home to Fujian to attend his wife's brother's wedding. However, when directly asked at the hearing about that trip, Lin stated that his wife "and a second child returned together," and then had the following exchange on cross-examination:

**INS:** You said that your wife went to a wedding with your younger son?

**Lin:** Not the second one.

**INS:** Which one?

**Lin:** The second one was too old already. It's the third one that one was pregnant with, '93, the one that was aborted.

\*\*\*\*

**IJ:** Sir, did she take any of—did she either of your two sons that were born with her when she went to her, to her brother's wedding?

**Lin:** Yes.

**INS:** You told us before she took your second son.

\*\*\*\*

**Lin:** No, the second son was brought from Hunan.

This testimony is somewhat scrambled. The IJ understood Lin to be saying that his wife was not in fact accompanied by his second son, and observed that, at various points in Lin's application and testimony, Lin asserted that his wife was accompanied by none, or by one, or by two children when she traveled from Hunan to the wedding. The IJ's finding was a plausible one, and the inference of inconsistency drawn from it was among those available.

(2) The IJ relied on the difference between Lin's assertion that Chinese officials gave his wife.a certificate after her forced abortion and the 1998 State Department Country Profile of China, which indicates that so-called "abortion certificates" are most likely doctors' excuse-letters for workers who undergo abortion voluntarily:

> The U.S. Embassy and Consulates General are unaware of any so-called "abortion certificates," which often are presented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by the law.

See U.S. Department of State, China: Profile of Asylum Claims and Country Conditions 24 (Apr. 14, 1998). From this Country Profile, the IJ drew the inference that

> either [Lin's] wife did not undergo an abortion, and therefore, the certificate was never issued, and [Lin] there [sic] very well may have tried to present a fraudulent document to the Court or if his wife in fact was given a certificate, it meant that according to the Profile[,] ... the abortion was voluntary.

■ The observations of State Department country profiles "do not automatically discredit contrary evidence presented by the applicant, and ... are not binding on the immigration court," *Tian–Yong Chen v. INS*, 359 F.3d 121, 130 (2d Cir.2004); they are probative nonetheless, *see id.*, and the profile in this case constituted a basis for the IJ to have found implausible Lin's testimony that his wife's abortion—as evidenced by the certificate—

was involuntary, *see Guan Shan Liao v. DOJ*, 293 F.3d 61, 71 (2d Cir.2002) (observing that "general information" in country reports "allows the trier of fact 'to determine if an alien's claim is ... plausible.' " (quoting *In re S–M–J–*, 21 I. & N. Dec. 722, 724 (BIA 1997))). An adverse credibility finding may be based in part upon testimony that the IJ finds inherently implausible, as long as the finding has a reasoned and supportable basis. *See Xiao Ji Chen v. DOJ*, 434 F.3d 144, 159 n. 12 (2d Cir.2006).

■ (3) The IJ observed that Lin's testimony was evasive:

> The Court would note that numerous times during the hearing, the respondent was asked a question and did not answer that question directly, and it took many questions by both his attorney, the Government attorney and the Court to sometimes receive an answer from the respondent as to what he was indicating had purportedly happened in answer to the question which was asked of him.

Evasiveness is, of course, one of the many outward signs a fact-finder may consider in evaluating demeanor and in making an assessment of credibility. Demeanor is virtually always evaluated subjectively and intuitively, and an IJ therefore is accorded great deference on this score—no less deference than that accorded other fact-finders, *see, e.g., Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[D]eterminations of demeanor and credibility ... are peculiarly within a trial judge's province."); *NLRB v. Dinion Coil Co.*, 201 F.2d 484, 487 (2d Cir.1952) (Frank, J.) ("[S]ince observation of [demeanor] is open to a trier of the facts when witnesses testify orally in his presence, and since such observation is not open to a reviewing tribunal, that fact-trier's findings, to the extent that they

comprise direct or testimonial inferences, are ordinarily unreviewable.") (internal citation and quotation marks omitted). As we explained in *Zhang:*

> A fact-finder who assesses testimony together with witness demeanor is in the best position to discern ... whether a question that may appear poorly worded on a printed page was, in fact, confusing or well understood by those who heard it; whether a witness who hesitated in a response was nevertheless attempting truthfully to recount what he recalled of key events or struggling to remember the lines of a carefully crafted "script"; and whether inconsistent responses are the product of innocent error or intentional falsehood.

386 F.3d at 73.

The IJ did err in finding two other discrepancies between Lin's testimony and his application. First, while the IJ accurately observed that Lin's application "indicated that when his wife returned home for her second pregnancy, she hid at" other people's houses, the IJ then erroneously observed that Lin "has not mentioned that today ...." In fact, Lin that day testified that

> [m]y wife when she return home, when she was 8 month pregnant [with the second child], she sometimes stay at my in-laws house. My in-laws live in the same village. Also, live in my house— live in the house of my cousins....

The IJ thus identified a discrepancy that does not exist: Lin's testimony was, if anything, more specific as to the houses in which his wife hid.[1]

Second, the IJ noted that Lin's asylum application claimed that family planning officials "destroyed my house," thus forcing Lin's family to flee to reunite with him

in Hunan, whereas Lin testified at the hearing that those officials merely "used a big hammer, and also a big reinforcing bar to damage our house and damage the windows, the door." The IJ inaccurately described Lin's testimony, asserting that Lin stated only that "a door and a window *were taken.*" (emphasis added). Moreover, there is no point of inconsistency between the application and the testimony. Lin nowhere said that any members of his family actually continued to live at the house after it was damaged, and made clear at the hearing that "when my wife saw what had happened, and the house was damaged, my wife was not able to stay at home."

### IV

■ Even if an IJ's decision contains errors, we may nonetheless deny the petition on the basis that remand is futile if (1) substantial evidence in the record relied on by the IJ, considered in the aggregate, supports the IJ's finding that petitioner lacked credibility, and (2) disregarding those aspects of the IJ's reasoning that are tainted by error, we can state with confidence that the IJ would adhere to his decision were the petition remanded.

*Singh v. BIA,* 2006 U.S. App. LEXIS 8808, at *4 (2d Cir.2006) (per curiam) (internal quotation marks omitted).

■ We conclude that these requirements are met here. While non-material, minor, and isolated disparities in an applicant's otherwise generally "consistent, rational, and believable" testimony need not be fatal to credibility, *Diallo v. INS,* 232 F.3d 279, 288 (2d Cir.2000); *see also Secaida–Rosales,* 331 F.3d at 308, these assessments are made in the first instance by the IJ (and the BIA), *see Diallo,* 232 F.3d at

---

1. The Government asserts that the reference in Lin's application to his wife's having hid in an empty "water vat," a detail omitted in his testimony, supplies the inconsistency. This additional detail is not an inconsistency, and in any event, the IJ did not rely on it.

288. In reviewing credibility determinations, our role is generally to evaluate whether the fact-finder made a reasonable determination as to the petitioner's credibility.

In *Zhang*, we stated in *dicta* that certain "minor and isolated" discrepancies could be "so plainly immaterial to a persecution claim that no reasonable fact-finder could use them as a basis for an adverse credibility ruling." 386 F.3d at 77 (internal quotation marks omitted). At the same time, review of a credibility finding is conducted on the record as a whole. *See Jin Chen v. DOJ*, 426 F.3d 104, 113 (2d Cir. 2005) ("We will affirm if the IJ's finding is supported by evidence that is 'reasonable, substantial, and probative' when considered in light of the record as a whole.") (quoting *Diallo*, 232 F.3d at 287); *cf. Secaida–Rosales*, 331 F.3d at 308 ("[T]he impact of omissions must be measured against the whole record before they may justify an adverse credibility determination."). Therefore, even where an IJ relies on discrepancies or lacunae that, if taken separately, concern matters "collateral or ancillary to the claim," *Secaida–Rosales*, 331 F.3d at 308, the cumulative effect may nevertheless be deemed consequential by the fact-finder, *see Xiao Ji Chen*, 434 F.3d at 160 ("Although the IJ acknowledged that these inconsistencies were minor, the IJ did not err in stressing the cumulative impact of such inconsistencies in making his adverse credibility determination.") (internal quotation marks omitted); *see also In re A–S–*, 21 I. & N. Dec. 1106 (BIA 1998) ("[A] credibility determination 'apprehends the overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence.'") (quoting *Matter of Lugo–Guadiana*, 12 I. & N. Dec. 726, 729 (BIA 1968)).

■ Fact-finding is—for better or worse—an accretive, assimilative, layered, instinctive process that is based on signs that are both objective (such as factual discrepancies) and subjective (such as demeanor). *See Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir.1952) (Hand, *J.*) (A jury "may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness"). The immigration context is no different. *See In re S–M–J–*, 21 I. & N. Dec. at 729 ("Testimony is not a discrete, self-contained unit of evidence examined and weighed without context; it is part of the body of evidence which is intertwined and considered in its totality."). "Adverse credibility determinations are appropriately based on inconsistent statements, contradictory evidence, and inherently improbable testimony; and where these circumstances exist in view of the background evidence on country conditions, it is appropriate for an Immigration Judge to make an adverse credibility determination on such a basis." *Id.*

■ Here, the IJ arrived at an adverse credibility determination based on consideration of factors that the BIA has deemed generally probative. Particularly damaging to Lin's credibility were his failure to mention the harassment of his parents in his asylum application and his confusion regarding the number of children who accompanied his wife when she traveled home to Fujian for her brother's wedding. As to the harassment of Lin's parents, we think that it was reasonable for the IJ to conclude that, given Lin's description of the reasons for his flight from China, the authorities' attacks upon his family members were traumatic events that he would have been expected to mention in his application. *See Pop v. INS*, 270 F.3d 527, 532 (7th Cir.2001) ("[I]t seems apparent that when asked to list specific incidents of mistreatment, a person might be inclined to list the most invasive events . . . ."). As to the number of children who accompa-

nied Lin's wife to a wedding, this is the kind of detail that would not greatly matter ordinarily. But Lin contends that his wife's trip home for her brother's wedding ended in the forced abortion of Lin's third child and that the abortion culminated in Lin's flight from home to a foreign land. Given the profound impact that Lin attributes to this episode, the IJ could draw an adverse inference from Lin's failure to recall the particulars of what happened.

Despite the errors made by the IJ in this case, the adverse credibility determination is supported by substantial evidence, composed of a seamless combination of the discrepancies in Lin's testimony; the discrepancies that appear when one compares his application, his testimony, and the country reports; and the IJ's demeanor finding. As we have no doubt that the IJ would have reached the same conclusions without reliance on the erroneous findings, we therefore deny Lin's petition for review.