In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1369

RODICA POP,

Petitioner,

v.

IMMIGRATION and NATURALIZATION SERVICE,

Respondent.

On Petition for Review
From the Board of Immigration Appeals
No. A72 670 847

Argued September 25, 2001--Decided November 2, 2001


   Before ROVNER, DIANE P. WOOD, and EVANS,
Circuit Judges.

   EVANS, Circuit Judge.  Rodica Pop, a
Jehovah's Witness since birth, left her
native Romania with her mother in 1993 at
the age of 15. She arrived in the United
States and was granted permission to stay
here for a few months as a "nonimmigrant
visitor." She stayed longer than that.
After the INS initiated deportation
procedures, the underlying facts of which
Pop conceded, she filed for asylum (and
withholding of deportation) in September
of 1994. An immigration judge (Fujimoto)
denied Pop's request and the Board of
Immigration Appeals adopted the IJ's
reasoning and affirmed. Pop's petition
seeks a review of that decision./1

   The starting point and ground rules in
a case like this have been stated many
times, so we'll note only a few of them
here. The Attorney General, in his
discretion, may grant asylum to an alien
who is a "refugee." 8 U.S.C. sec.
1158(b). A refugee is defined as one who
is unable or unwilling to return to her
home country "because of persecution or a
well-founded fear of persecution on
account of race, religion, nationality,
membership in a particular social group,
or political opinion."/2 8 U.S.C. sec.
1101(a)(42)(A). If past persecution is
demonstrated, a presumption arises that

the applicant has a well-founded fear of future persecution. 8 C.F.R. sec. 208.13(b)(1)(i). The presumption is rebuttable if conditions in the country from which the applicant fled have changed "to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." Id. Even if the presumption is rebutted, an applicant may still qualify as a refugee based on past persecution alone if she "demonstrates compelling reasons for being unwilling to return to . . . her country of nationality . . . arising out of the severity of the past persecution."/3 8 C.F.R. sec. 208.13(b)(1)(ii); Bucur v. INS, 109 F.3d 399, 404-05 (7th Cir. 1997).

The BIA's determination that Pop was not eligible for asylum must be upheld if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We reverse only if the evidence is such that a reasonable fact finder would be compelled to reach an opposite conclusion. Id. Where the BIA adopts the reasoning of the IJ, as it did here, we review the IJ's analysis. Dobrican v. INS, 77 F.3d 164, 167 (7th Cir. 1996).

With these principles in mind, we turn to Pop's case. Pop testified to a number of incidents underlying her claim of persecution. She said that her grade school teachers intentionally lowered her grades so she could not advance within the Romanian school system. In the fourth grade, Pop said a teacher beat her until she passed out because she refused to bow in front of the Romanian flag during a patriotic ceremony. In the fifth grade, a teacher beat her for refusing to join the Young Communist Union because she was a Jehovah's Witness. Other teachers beat her and, Pop said, she was laughed at when she attempted to answer questions in class. Pop testified that she was beaten for carrying the Bible to religious gatherings. She also testified that the police raided her house more than five times, that she was stopped on the street, and that the police kept Jehovah's Witnesses under surveillance.

We understand Pop to be making two main claims. First, she claims that her grade-

school teachers intentionally lowered her grades because she was a Jehovah's Witness. As a result, Pop says she was unable to pursue her education beyond the eighth grade. She claims that if sent back to Romania, her low grades will foreclose access to further education and, therefore, dim her economic prospects. This is an argument about the future effects of past persecution. Pop is not arguing that those who would deny her access to educational opportunities in Romania will be persecuting her because of her religion./4 Rather, she is arguing that the effects of past persecution--i.e., her artificially low grades--will be visited on her in the future because they will foreclose advancement in the Romanian educational system. How that will all play out, for Pop is now at least 23 years old, is unclear. Nevertheless, the question toaddress is whether this claim of past persecution, assuming it occurred, is severe enough to qualify Pop for asylum. 8 C.F.R. sec. 208.13(b)(1)(ii); Bucur, 109 F.3d at 404-05.

Pop also alludes to the beatings she suffered in school and the harassment, by police and villagers, against her because she is a Jehovah's Witness. This potentially gives rise to a second claim that she will be subjected to persecution anew if she returns to Romania. If Pop could establish past persecution on this basis, it would give rise to the presumption of a well-founded fear of future persecution, but the government argues that this presumption is rebutted by the changed conditions in Romania since the fall of Ceausescu, the infamous Communist dictator, in 1989.

We need not travel very far down the road suggested by either claim, however, because Judge Fujimoto found that Pop did not meet her burden of establishing past persecution (at all) because her claim was not credible./5 An applicant has the burden of proving that she meets the definition of a refugee. 8 C.F.R. sec. 208.13(a). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." Id. We give Judge Fujimoto's credibility determination substantial deference. Ahmad v. INS, 163 F.3d 457, 461 (7th Cir. 1999). Credibility determinations are questions

of fact and "should only be overturned under extraordinary circumstances," although they must be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." Id. (citations omitted).

Judge Fujimoto noted three bases for questioning Pop's credibility. First, Pop testified that she graduated from the eighth grade in 1989 (before the Communist government fell). Her transcript reveals, however, that she graduated 2 years later, in 1991. Second, Pop testified that she received low conduct grades and that her rejection from further education was based, in part, on these grades. But her transcript reveals that she received high conduct marks throughout grade school. Third, Pop testified that the police raided her family's home to find Bibles, that she was beaten on her way to religious gatherings, and that the police kept Jehovah's Witnesses under surveillance. Strangely, she did not mention these incidents in her asylum applications or during her interview with the INS./6

Judge Fujimoto's first two bases for his credibility determination concern Pop's first claim that she was persecuted when her teachers lowered her grades. The inconsistencies between Pop's testimony and her transcript go to the heart of this claim, and the transcript shows she received her lowest grades a year and a half after the fall of Ceausescu./7 She also testified that her low conduct grades affected her application for further schooling. Yet her conduct grades were perfect except for in the fifth grade. The written transcript clearly reveals inconsistencies in Pop's testimony.

Further evidence in the record supports Judge Fujimoto's determination. Pop's grades were not consistently poor even though she was a Jehovah's Witness throughout her grade school education. Her grades did not drop precipitously un til fifth grade. Even then, the only academic term in which she received mainly failing grades in her academic subjects was 1990-91, after the revolution. Yet, even at that point, her grades were as high as they had ever been in music, physical education, agriculture, and conduct. We can find no

"extraordinary circumstances" to warrant upsetting the judge's credibility determination based on the inconsistencies in Pop's testimony regarding her academic record.

The judge also questioned Pop's credibility concerning her second claim, that she suffered past persecution because she was beaten outside of school, her home was raided, and Jehovah's Witnesses were kept under police surveillance. We hesitate to find that one seeking asylum must state in his or her application every incident of persecution lest the applicant have his or her credibility questioned if the incident is later elicited in direct testimony. See Aguilera-Cota v. INS, 914 F.2d 1375, 1382 (9th Cir. 1990) ("Aguilera's failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility."). Asylum forms are frequently completed without the advice of counsel by poor, illiterate people who do not speak English. Id. Pop testified that her uncle and aunt filled out her first asylum application because she did not understand it.

That said, Pop did not mention the incidents in either of two asylum applications. The application form in the record specifically asked whether Pop had been "mistreated" by government authorities and requested detailed information about the mistreatment. Moreover, Pop did not mention the incidents in an interview with an INS official. It is important to note also that Pop's present application focuses on the limited educational and economic opportunities available to her in Romania. Without denying the gravity of these concerns, it seems apparent that when asked to list specific incidents of mistreatment, a person might be inclined to list the most invasive events, such as government raids and surveillance. Judge Fujimoto apparently interpreted the omission as bearing on whether these incidents actually happened. Moreover, Judge Fujimoto was considering these omissions in the context of a record that contained other inconsistencies in testimony, which he, unlike us, heard firsthand. We do not believe that "extraordinary circumstances" exist in

the record to warrant overturning the
adverse credibility finding that doomed
Pop's claim.

   The order under review is Affirmed.

FOOTNOTES

/1 Because Pop entered deportation proceedings prior
to April 1, 1997, we apply statutory immigration
law as it stood prior to passage of the Illegal
Immigration Reform and Immigrant Responsibility
Act of 1996. See Bradvica v. INS, 128 F.3d 1009,
1011 n.1 (7th Cir. 1997).

/2 The standard for withholding deportation is more
strict, requiring a "clear probability" that
persecution will occur upon the applicant's
return. 8 U.S.C. sec. 1253(h)(1). Accordingly, if
Pop cannot meet the asylum standard, she cannot
meet the standard for withholding deportation.
Iliev v. INS, 127 F.3d 638, 641 (7th Cir. 1997).

/3 Bucur applied the (double) standard found in 8
C.F.R. sec. 208.13(b)(1)(ii), which states that
an applicant who cannot rely on a fear of future
persecution must show a severe form of past
persecution to qualify as a refugee. The appli-
cant in Bucur did not challenge the regulation
itself, 109 F.3d at 405, nor does Pop.

/4 See br. of pet'r at 28 ("Rodica's claim is not
that she is prevented from practicing her reli-
gion, but that she faces continuous punishment
for her past disobedience due to her religious
beliefs . . . ."); id. at 35 ("Even if Rodica is
free to practice her religion, she is not free
from the past persecution she suffered as a child
because of it.").

/5 Even if the claim had been credible, Judge Fuji-
moto also found that it did not rise to the level
of persecution. Because we affirm on other
grounds, we need not consider whether the acts
alleged constitute persecution.

/6 The applications include the present one and one
that Pop previously had completed. The present
application is included in the record but the
latter one is not. Nonetheless, Pop admitted that
she did not list these incidents in the latter
application.

/7 Pop claims that Judge Fujimoto overemphasized the
importance of this inconsistency because he had
an overly rosy view of change in the years
immediately following the revolution. She claims
that he erred by relying on the State Depart-
ment's optimistic report on Romania. It is un-
clear whether Judge Fujimoto relied on thisreport

specifically when weighing this inconsistency. His determination was based, at least in part, on the simple fact that Pop testified incorrectly as to when she graduated from eighth grade. To the extent that Judge Fujimoto did rely on the report, he was entitled to do so. Kaczmarczyk v. INS, 933 F.2d 588, 594 (7th Cir. 1991) (holding that it was not error for the BIA to take notice of changed conditions in a country and to base its findings on State Department advisory opinions, to which "we give considerable weight").