In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3004

GUEORGUI KROUCHEVSKI,

*Petitioner,*

*v.*

JOHN D. ASHCROFT,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A71-846-856

SUBMITTED[1] MAY 19, 2003—DECIDED SEPTEMBER 11, 2003

Before EASTERBROOK, ROVNER and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* A few days after his arrival in the United States, Gueorgui Krouchevski applied for asylum under 8 U.S.C. § 1158. According to his application, Krouchevski belonged to an anti-communist group in his native Bulgaria—the Alliance of Democratic Forces—and feared that he would be put in jail if he returned to that country. In 1994, the Asylum Office of the Immigration and Naturalization Service denied the application and

---

[1] This appeal was submitted on the briefs and the record after we granted the appellant's motion to waive oral argument. See Fed. R. App. P. 34(f); Circuit Rule 34(e).

initiated deportation proceedings against Krouchevski, who conceded deportability but renewed his request for asylum or a withholding of deportation.[2] In support, Krouchevski filed a second application for asylum, this time claiming to belong to the United Macedonian Organization ("UMO-Ilinden"), a political party that seeks greater rights for ethnic Macedonians in Bulgaria, but which is banned under a provision of the current Bulgarian constitution prohibiting political groups organized along ethnic lines. Krouchevski asserted by affidavit that he was a founder and leader of UMO-Ilinden; that Bulgarian police arrested and beat him for organizing a UMO meeting in 1989; and that Bulgarian authorities remain committed to imprisoning him for his political activities—despite Bulgaria's transformation in the early 1990's from a communist to a democratic state. An Immigration Judge denied the second application; the Board of Immigration Appeals adopted the IJ's reasoning and affirmed. Krouchevski petitions us for review of that decision.

The law governing Krouchevski's case is familiar. The Attorney General has discretion to grant asylum to an alien who is a "refugee." 8 U.S.C. § 1158(b). A refugee is one who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). If the alien demonstrates past persecution, a rebuttable presumption arises that the applicant has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). Alternatively, if the applicant

---

[2] Because Krouchevski entered deportation proceedings prior to April 1, 1997, we apply statutory immigration law as it stood prior to passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See Bradvica v. INS*, 128 F.3d 1009, 1011 n.1 (7th Cir. 1997).

proves that it is more likely than not that he or she will suffer persecution—a more difficult task than demonstrating a "well-founded fear" of persecution—then the Attorney General may not order him or her out of the country. *See* 8 U.S.C. § 1231(b)(3). Where, as here, the Board of Immigration Appeals adopts the IJ's reasoning, we review the IJ's analysis. *See Ursachi v. INS*, 296 F.3d 592, 594 (7th 2002).

Seeking to establish that he qualifies as a refugee, Krouchevski testified at a hearing before the IJ that he is an ethnic Macedonian who became involved with UMO-Ilinden around 1985, when the organization first began coalescing into a unified, national movement. The organization seeks cultural and economic autonomy for ethnic Macedonians living in Bulgaria; the current democratic government of Bulgaria, like its communist predecessor, refuses even to recognize Macedonians as an ethnicity distinct from Bulgarians, and there are reports from various human rights organizations that Bulgarians who claim a Macedonian heritage are sometimes subjected to discrimination, police harassment, and intimidation. Krouchevski says he eventually became an "organizer" or "coordinator" for UMO-Ilinden in the Plovdiv region of Bulgaria, planning and holding meetings and coordinating public demonstrations in support of Macedonian rights. He claimed that Bulgarian police under the communist government detained him many times, questioning him about his political activities and demanding that he desist his organizing. Then, on August 2, 1989, police allegedly raided his home during a UMO-Ilinden meeting. According to Krouchevski's testimony, the police arrested him and his father and held them for two days, periodically interrogating them regarding the UMO and beating them. At the end of this ordeal, Krouchevski was taken to a hospital, where he was treated for a concussion.

Soon afterwards, Krouchevski received a summons to appear before a Bulgarian court, charged with violating § 108 of the Bulgarian penal code. That provision makes it a crime to preach violent overthrow of the social order, though Krouchevski maintains that it was actually used to quell internal dissent during the communist era. Krouchevski failed to appear as requested; he testified that another member of UMO-Ilinden had been sentenced to three years' incarceration under circumstances identical to his, and so he knew that he stood a good chance of going to prison for his political activities. In March 1990 Krouchevski received another summons; this time he fled Bulgaria rather than appearing, traveling through Europe to Canada and eventually reaching the United States.

Krouchevski claims not only that his arrest and beating constituted past persecution, but also that he has a well-founded fear of future persecution. This fear stems, Krouchevski claims, from the Bulgarian government's continued interest in prosecuting him for violating § 108. As proof of the government's intention, he points to photocopies of letters allegedly sent in 1996 by a Bulgarian prosecutor to Krouchevski's wife, who remains in Bulgaria. The English translation advises that Krouchevski "has been sought to appear at court case #1093/19(89) which has been kept open yet [sic]."

The IJ rejected Krouchevski's claims, primarily because he thought that the story Krouchevski told was incredible. The IJ gave several reasons for disbelieving Krouchevski's testimony. The IJ noted, first, that Krouchevski's original asylum application did not mention UMO-Ilinden at all, nor did it describe his alleged arrest and beating by Bulgarian police. These claims appeared only in the second application, filed in 1994—after the communist government had disintegrated and a new democratic state was emerging. Second, there are inconsistencies between

Krouchevski's 1994 application and his testimony before the IJ. Specifically, Krouchevski alleged on his application that when police raided the UMO meeting in 1989, they arrested all 10 or 15 participants, including Krouchevski and his father; when he testified at the hearing, Krouchevski asserted that only he and his father were arrested. The meeting's purpose also changed between the time of the application and the time of the hearing: the application reports that the meeting commemorated a Macedonian uprising in 1903, but Krouchevski testified that the meeting aimed to persuade local authorities to reopen a church. Similarly, Krouchevski asserted in his application that his father was also indicted for violating § 108 of the Bulgarian penal code; at his hearing, he denied that there was any such "court case" against his father, who remained in Bulgaria.

Third, the IJ noted that the circumstances of Krouchevski's 1990 departure from Bulgaria cast doubt on his claim to be a leader of the UMO. According to Krouchevski's own documentary evidence, the Bulgarian government in 1990 prevented prominent members of UMO-Ilinden from leaving the country, either by confiscating their passports or denying them exit visas, or both. Notwithstanding his self-proclaimed leadership position within UMO-Ilinden, however, Krouchevski was in fact able to obtain a passport and exit permit to leave Bulgaria in 1990. Confronted with this information during the hearing before the IJ, Krouchevski first claimed that he had actually left Bulgaria in 1988. Then he testified that he gave his passport "to some other fellow passenger," who had it stamped while Krouchevski hid from authorities on his train. The IJ ultimately disbelieved these explanations, like Krouchevski's explanations for the discrepancies between his testimony and the record evidence.

On appeal, Krouchevski's central obstacle is that the bulk of his evidence consists of his testimony, and the IJ

found that testimony to be incredible. Without casting doubt on the IJ's adverse credibility determination, therefore, Krouchevski cannot point to pertinent evidence demonstrating that he qualifies for asylum. *See* 8 C.F.R. § 208.13 (applicant has burden of demonstrating his qualification for asylum). Krouchevski faces an uphill battle in this regard. An IJ's credibility determination must be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding," *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999), but if it is, only "extraordinary circumstances" can justify our overturning it. *See Pop*, 270 F.3d at 530-31; *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). Furthermore, we will uphold the determination that Krouchevski was not eligible for asylum if it is supported "by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Pop v. INS*, 270 F.3d 527, 529 (7th Cir. 2001). We reverse only if the evidence is such that a reasonable fact finder would be compelled to reach an opposite conclusion. *Pop*, 270 F.3d at 529.

Krouchevski's arguments on appeal do not convince us to overturn the IJ's findings. He focuses mostly on the possibility that the discrepancies noted by the IJ were actually the result of mistranslated or misunderstood testimony, and thus not "real" discrepancies. He claims, for example, that when he testified that only he and his father were arrested after the UMO meeting, what he really meant was that out of the 10 or 15 people detained, only he and his father were actually *charged* with a crime. Similarly, he asserts that there is no discrepancy between saying that the authorities indicted his father and saying there was no "court case" against his father; what he meant, explains Krouchevski, is that there was no *current* case against his father. Although Krouchevski's *post hoc* interpretations of his statements indeed draw consistencies out of apparent discrepancies, his interpretations are not the only ones possible. Those offered by the

IJ also appear to be valid, and where credibility determinations are concerned "a reviewing court should not supersede an administrative agency's findings simply because an alternative finding could also be supported by substantial evidence." *Ahmad*, 163 F.3d at 461.

Krouchevski also suggests that the documentary evidence he submitted corroborates his story, and thus should convince us that the IJ's credibility determination was wrong. This evidence includes what purport to be photocopies of the letters sent to his wife by the Bulgarian prosecutor, copies of the two summonses sent to him in 1990, a hospital report from 1989 establishing that Krouchevski sustained a concussion in police headquarters, and a 1997 letter to the editor of a Bulgarian newspaper describing Krouchevski as a Macedonian activist. The IJ disbelieved the authenticity of the first three of these documents, which apparently were not issued on official stationary—but even if the documents are authentic, they do not prove by themselves that Krouchevski is telling the truth regarding his involvement in UMO-Ilinden. The summonses note that Krouchevski is charged with violating § 108 of the Bulgarian penal code, but that charge could have arisen from his participation in an anti-communist group, as his original asylum application claimed. The alleged letters from the prosecutor reveal nothing about the nature of the case against Krouchevski; he could as easily be charged for stealing bicycles as for organizing a Macedonian political party. Similarly, the hospital report does not show how or why Krouchevski sustained the concussion at police headquarters in 1989. In other words, these three documents could corroborate any number of stories; they do not prove that the one Krouchevski told is the truth. And though the letter to the editor corroborates Krouchevski's claim to have been a Macedonian activist in Bulgaria, it does not prove that he ever suffered persecution for that activism.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—9-11-03