**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 20, 2005
Decided June 15, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

No. 04-1931

| | |
|---|---|
| AGIM STERMOLLI and ELIDJONA STERMOLLI,<br>    Petitioners,<br><br>    *v.*<br><br>ALBERTO R. GONZALES,* Attorney General of the United States,<br>    Respondent. | Petition for Review of an Order of the Board of Immigration Appeals<br><br>Nos. A79-583-042 & A79-583-043 |

**O R D E R**

Agim and Elidjona Stermolli, husband and wife, are Albanians who sought asylum based on past persecution on account of political opinion. An Immigration Judge denied relief because Agim (the lead applicant), failed to meet his burden of supporting his claim with credible testimony, and the BIA dismissed the appeal. We deny the petition.

Agim and Elidjona are Albanian citizens from the Albanian district of Korca, from where they fled to Greece, then to Mexico with fake Greek passports, and finally to the United States, which they entered illegally in October 2000. After they were here for eleven months, Agim applied *pro se* for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). An asylum officer

---

*Pursuant to Fed. R. App. P. 43(c), we have substituted Alberto Gonzales for John Ashcroft as the named respondent.

referred Agim's case to the Executive Office for Immigration Review, and Agim obtained counsel and filed a supplemental written statement. Elidjona's claim is derivative of Agim's and stands or falls with his.

Agim testified that he became politically active in 1996—four years after the fall of the communists in Albania—when he joined the Legality Movement. The Legality Movement is a minority party that advocates a return to monarchy in Albania. When Agim joined, the Legality Movement was pushing for the passage of a referendum—to be held before the regular elections in 1997—for the return of a king. To support the referendum, Agim participated in party meetings and disseminated party information.

Agim testified to being attacked twice for belonging to the Legality Movement. The first of these attacks came on the day of the referendum in 1997 when he was assaulted while walking to party headquarters by men in civilian clothes who hit him with clubs and their gun butts. The men called Agim a "kulak," a term used for certain families persecuted under the communists, and Agim later testified thinking that they "were police officers, because they talked to me only about the party." He assumed that these men were police because the police knew him to be a member of the Legality Movement. After the men hit him, they left him on the ground. Then he went to a clinic for treatment on two lacerations that he suffered in the beating.

The next attack occurred three years later during another election in October 2000. At that time Agim was assigned to be a poll watcher for the Legality Movement at the Bulgarec voting station in Korca. While monitoring the polls, he observed voting violations, including people casting votes for dead voters. After the election, members of parties like Agim's Legality Movement and the Albanian Democratic Party—both of whom opposed the ruling Socialist Party—held a rally to express concern over voting manipulations. At the rally Agim described voting violations he observed, but the police broke up the meeting and arrested him and five others. Agim was detained for three days at the Korc'a police station. Although his testimony regarding his detention is somewhat difficult to parse, Agim said that he was beaten every few hours for fifteen minutes or more at a time. During the beatings, he was questioned about his political party and the voting violations he witnessed. He also testified that on at least one occasion his hands were tied over his head for two hours. Last, he said that the police took him to receive medical treatment (it is not clear where), but "only for the marks that were very visible." Agim also testified generally that, after his release, the police "threatened" him and warned him not to tell anyone about what they did to him.

The IJ denied all of Agim's—and therefore Elidjona's—claims for relief. First, the IJ reasoned that Agim's testimony was too vague and inconsistent to be

credible. In part, the IJ discredited Agim's testimony because his asylum application neglected to mention the 1997 election-day beating. The IJ also found that Agim's testimony of his three-day beating in 2000 lacked detail and made "little sense." Furthermore, the IJ was troubled by Agim's failure to provide background information about the Legality Movement. Additionally, the IJ found that documentary evidence Agim submitted to be too unreliable to corroborate the testimony, stating that it was "impossible to conclude that the information contained therein is reliable or that they are from the people that they allegedly have come from." Among other things, the IJ noted that "none of the documents" were on "official stationary." Not only did the documents fail to save Agim's testimony, the IJ reasoned that they "cast[ ] serious doubt on the accuracy of the respondent's story" because some of the documents conflicted with details in Agim's testimony.

The BIA dismissed Agim's appeal, concurring "with the Immigration Judge's finding that [Agim's] testimony was inconsistent, and he failed to meet his burden of proof to provide testimony that was 'believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear.'" Like the IJ, the BIA also discredited Agim's testimony because his asylum application omitted any reference to the beating in 1997, and because a written statement filed with the IJ said that he was attacked by "several men" rather than "two plain-clothed police officers," as he testified at his hearing. Next, the BIA reasoned that the documents that Agim submitted to corroborate his story could not satisfy his burden of proof because they were unreliable and had not been authenticated.

The only issues that the Stermollis raise in their petition concern the BIA's credibility determination.[1] We review the BIA's factual determinations deferentially. *See Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004); *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004). To warrant overturning a credibility determination, the evidence must be "such that a reasonable fact finder would be compelled to reach an opposite conclusion." *Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Pop v. INS*, 270 F.3d 527, 529 (7th Cir. 2001). Still, the credibility determination must be supported by "'specific, cogent reasons' that 'bear a legitimate nexus to the finding.'" *See Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003) (internal citation omitted).

---

[1]Only Agim's asylum claim is before this court because he failed to raise his CAT claim in his opening brief, *see Lin v. Ashcroft*, 385 F.3d 748, 750 (7th Cir. 2004); *Brucaj v. Ashcroft*, 381 F.3d 602, 611 n.7 (7th Cir. 2004), or make any argument why the IJ and BIA erred by denying withholding of removal, *see* Fed. R. App. P. 28(a)(9)(A); *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004).

And those reasons should go to the "heart" of the claim.  *See Capric v. Ashcroft*, 355 F.3d 1075, 1090 (7th Cir. 2004).

The Stermollis first argue that because Agim did not have a lawyer's help when filling out his asylum application, the BIA unfairly discredited him for not specifying the 1997 beating in that application.  The Stermollis are right that an omission in itself from a *pro se* application should not determine the outcome of a case; indeed, we have been reluctant to penalize applicants who made such omissions when they did not have lawyers to help them write their applications.  *See Pop*, 270 F.3d at 531–32.  Yet Agim compounded that omission by failing to mention in his subsequent counseled, written statement that his attackers in 1997 were police. An omission that is repeated or further confused by a discrepancy is far more serious than the first *pro se* mistake.  *See id.* at 532.

The Stermollis next argue that the BIA was merely "splitting hairs" when it discredited Agim's testimony because of the discrepancy between his counseled, written statement stating that he was attacked by "several men" in 1997 and his oral testimony specifying "two plain-clothed police officers."  They insist that there was no inconsistency at all—except the difference between "several" and "two"—because Agim was only speculating at his hearing that his attackers were police.

But the Stermollis' argument misses the point.  The BIA based its opinion not on a distinction between "several" and "two," but instead on the difference between being attacked by "men" or "police."  And that discrepancy is hardly trivial. In fact, whether  he was attacked by "police" is vital to Agim's claim for asylum, which requires his persecutors to have been government agents or people whom the government is unable or unwilling to control.  *Balogun v. Ashcroft*, 374 F.3d 492, 499 & n.8 (7th Cir. 2004); *Guchshenkov v. Ashcroft,* 366 F.3d 554, 557 (7th Cir. 2004); *Bace v. Ashcroft*, 352 F.3d 1133, 1138–39 (7th Cir. 2003).  Here, apart from the speculation that these men were police—from which the Stermollis now distance themselves—the Stermollis offer no link at all between Agim's attackers and the government.  Therefore, given the legal significance of the distinction between being beaten by "men" or "police," the BIA's reasoning cuts to the heart of the claim, so this discrepancy supports the credibility determination.  *See Pop*, 270 F.3d at 531–32; *see also Capric*, 355 F.3d at 1090 (holding that discrepancies that go to the heart of the claim are most probative of an adverse credibility determination).

In fact, to emphasize the significance of this "men" vs. "police" discrepancy to Agim's claim, it is worth noting that Agim may not be able to establish past persecution at all if the 1997 beating was not carried out by the Albanian government or people it was unable or unwilling to control.  In their opening brief,

the Stermollis argue generally that the "harms that befell Mr. Stermolli in Albania rise to the level of persecution" but nonetheless fail to identify the specific "harms" upon which Agim is basing his asylum claim. Yet the claim can rest on only two possible bases: the 1997 beating and the 2000 detention. Attempting to revive Agim's credibility by downplaying the importance of the 1997 incident to the claim, the Stermollis asserted in a conclusory fashion at oral argument that the 2000 detention and beating would be enough to warrant asylum. But that is not necessarily so. In fact, we have affirmed a decision of the BIA denying asylum based on past persecution for a man who was detained for three days, deprived of food, and beaten until his face swelled. *See Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir. 2003). In affirming, we pointed to the lack of specific testimony, including the lack of specificity about injuries, and the one-time nature of the detention. *See id.*; *see also Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (holding that an applicant who was "interrogated at various times by the police, detained for twenty-four hours, harassed for money, and beaten, causing an injury to his hands" did not suffer past persecution). Here, the Stermollis neither cite nor attempt to distinguish *Dandan*, and as noted above, Agim's testimony was difficult to parse and left the IJ understandably confused about the duration and the severity of the beating and whether Agim suffered any injury.

In any event, considering the limited scope of our review, we cannot say that the Stermollis' limited attack on the BIA's reasoning compels us to reverse, *see Krouchevski*, 344 F.3d at 673, and the petition for review is DENIED.