**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 1, 2005
Decided December 1, 2005

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-3867

| | |
|---|---|
| FEI FENG WENG,<br>        *Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals |
| *v.* | No. A76-525-955 |
| ALBERTO GONZALES,<br>        *Respondent.* | |

**O R D E R**

Fei Feng Weng, a native of China's Fujian Province, petitions for review of a final order of removal. The Board of Immigration Appeals concluded that Weng did not credibly establish that he suffered past persecution or had a well-founded fear of future persecution. Weng argues that the adverse credibility determination is based on minor inconsistencies that do not go to heart of his claim. Because substantial evidence supports the BIA's decision, we deny the petition for review.

## I.

Weng entered the United States at Orlando International Airport on May 19, 2000, and immediately requested asylum, claiming that he feared returning to China because he would be forcibly sterilized under China's family planning policies.[1] During his initial interview, *see* 8 U.S.C. § 1225(b)(1), he stated that he and his wife already had one child, a daughter, and "the government will not let us have anymore." He asserted that his wife "had an IUD" and "they were coming to get me to sterilize me." He also stated, "My wife was made sterile and they want to do it to me." One month later, a credible-fear assessment was conducted. When asked why he left China, Weng stated that in April 2000 government officials forced his wife to abort their second child. Because his wife had "bad health" after the abortion, Weng asserted, "she could not be sterilized so they wanted to sterilize me." He stated that five family planning officials who "wanted to arrest" him came to his house to take him to be sterilized. Weng stated that he was able to run away after fighting off the two officials who were holding him down. He hid with relatives until he left China.

Weng first appeared before an IJ on September 20, 2000, for a preliminary hearing. The hearing took place in New York City at Weng's request. After being asked several times without providing a clear answer, Weng told the IJ that he lived in New York City with a female cousin and that he did not have a job. The IJ

---

[1]We are seeing a marked increase in the number of asylum claims from Chinese nationals (both male and female) who object to what is referred to as China's coercive family planning policies. Mr. Weng's was just one of three scheduled for oral argument on November 1, 2005. Because these claims seem to be coming to us with greater frequency, we asked counsel for the government, N. Christopher Hardee, to check and see if the Department of Homeland Security (DHS) has noticed this increase. Mr. Hardee has responded to our request and we thank him for his attention to this matter.

In his letter to us, Mr. Hardee states that the DHS "does not report the number of coerced family planning claims filed by asylum applicants in public reports of immigration statistics. However, the Headquarters Asylum Division, which is part of DHS, Citizen and Immigration Services, Office of International Affairs, has advised that during fiscal year 2005, with respect to asylum applications filed with DHS (but not including asylum applications filed for the first time in removal proceedings), 2,445 asylum applications based on China's family planning policies were adjudicated. Of these adjudications, DHS granted 1,277 applications, revoked one grant, denied six applications, and referred 1,153 to immigration judges."

ordered Weng to bring his cousin to the next hearing.  Weng then stated that his cousin actually lived in Indiana while he occupied her New York apartment, and that she continued to support him by having a friend in New York bring him money. At the next hearing, on November 20, 2000, Weng's attorney opened the hearing by confessing to the IJ that "everything" Weng said at the last hearing "except for possibly his name" was untrue.  Counsel stated that a snakehead, or paid smuggler, told Weng what to say if he came to court, and that Weng was nervous and "did not explain everything the way he wished."  In fact, Weng had been living and working in Indiana for about two months at the time of the first hearing, and the female cousin he had described did not exist.  The IJ again had trouble eliciting answers from Weng regarding his residence and workplace.  Weng did not know his address in Indiana. He admitted that he had lied at the previous hearing—of course, he was under oath at that time—and apologized to the IJ. Weng then conceded removability as charged in the Notice to Appear.

The IJ in New York City held a third hearing on March 28, 2001.  At that time Weng submitted his written application for asylum, withholding of removal, and relief under the Convention Against Torture.  In his affidavit supporting the application, Weng stated that his wife became pregnant in early 2000 and went into hiding because the couple did not have permission to have a second child but wanted to have a son.  When Weng's wife missed her quarterly checkup, family planning officials came to the couple's home looking for her.  Officials "often" came to the house "to give [them] a hard time" and told Weng that they would "take" him if they could not "take" his wife.  The couple "had no choice" and Weng's wife was forced to terminate the pregnancy.  The IJ asked Weng whether his statement was complete and accurate, and Weng answered that it was.  The IJ then agreed to transfer the case to Chicago.

Weng appeared with a new attorney for a preliminary hearing before the IJ in Chicago on November 1, 2001, and a merits hearing was scheduled for September 11, 2002.  At his merits hearing Weng testified that his wife involuntarily submitted to an IUD insertion after the birth of the couple's daughter. The IUD later "fell off" accidentally and Weng's wife became pregnant.  Weng testified that he and his wife were "devout" Christians and did not want to abort the baby, so his wife went to hide with relatives.  Nevertheless, after about three months authorities found Weng's wife at the couple's home and forced her to have an abortion.  Weng testified that after the abortion, family planning officials demanded that his wife have another IUD inserted and that he be "subject to a sterilization operation."  When asked why officials would require his sterilization given his wife's IUD insertion, Weng stated that officials wanted to penalize the couple for hiding the pregnancy.  Weng testified that he left China to avoid being sterilized.  He stated that he feared returning because "they would detain me and

forcefully make me go through the sterilization operation" and also subject him to "physical force"and "abuse."

The IJ denied all forms of relief upon concluding that Weng was not credible. The IJ cited the inconsistencies between Weng's testimony and his initial interview, credible-fear assessment, and affidavit, including Weng's "eleventh-hour" claim to be a devout Christian, and the "preposterous" story about escaping from five government officials that Weng recounted only during his credible-fear assessment. The IJ also doubted that Weng's wife's IUD "fell out" accidentally, that she had been forced to abort her second pregnancy, that Weng rather than his wife was the target of sterilization efforts, and that Weng had been smuggled out of China rather than leaving with a valid passport. The IJ also noted—twice—that Weng's testimony that his father was a fisherman contradicted his earlier statement that his father worked "on a boat."

Weng appealed to the BIA, which dismissed the appeal and issued a brief opinion. The BIA also concluded that Weng was not credible, citing three inconsistencies in Weng's testimony regarding events it deemed central to his claim. First, Weng asserted in his credible-fear interview that he escaped from five government officials who had come to arrest and forcibly sterilize him, but never mentioned this incident during prior or subsequent proceedings. Second, Weng did not repeat in other proceedings the assertion made during his credible-fear interview that government officials intended to sterilize his wife following her forced abortion. Finally, the BIA noted that Weng never mentioned his wife's forced IUD insertion in either his initial interview or credible-fear assessment although he discussed it at his hearing. Weng appeals.

## II.

We will uphold a decision of the BIA if it is supported by reasonable, substantial, and probative evidence in the record considered as a whole and the evidence does not compel the contrary result. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004). To qualify for asylum Weng must show that he suffered past persecution or that he has a well-founded fear of future persecution on account of a protected ground. *See* 8 U.S.C. § 1101(a)(42)(A); *Li v. Gonzales*, 416 F.3d 681, 685 (7th Cir. 2005). The statutory section defining the protected grounds has been specifically amended to account for applicants who allege persecution based on coercive family planning policies. *See* 8 U.S.C. § 1101(a)(42)(B); *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). An applicant's credible testimony in itself may be sufficient to establish asylum eligibility. *See Hussain v. Ashcroft*, 424 F.3d 622, 629 (7th Cir. 2005); *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004). However, when the testimony is found not to be credible, the applicant must provide a convincing explanation of the

discrepancies or extrinsic and credible corroborating evidence. *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005); *Capric*, 355 F.3d at 1086.

In this case there is little in the record to support Weng's claim apart from his testimony. Although Weng at his hearing introduced several documents (marriage and birth certificates, a baptismal certificate, and record of a quarterly physical examination of his wife), these were not admitted into the record because Weng did not produce them in a timely manner; the IJ accepted them "for identification purposes" only.[2] Thus Weng can succeed only if he undermines the adverse credibility determination. *See Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003). An adverse credibility determination must be supported by specific, cogent reasons that bear a legitimate nexus to that finding. *Balogun*, 374 F.3d at 498; *Jamal-Daoud*, 403 F.3d at 922.

Weng challenges the decisions of both the IJ and the BIA, arguing that they based the adverse credibility determinations upon minor inconsistencies that do not go to the heart of his claim. Weng also faults the IJ for ignoring evidence and using information outside the record to discredit his testimony. The IJ's decision, however, is not before us. When the BIA independently reviews the record and issues its own opinion, this court reviews only the BIA's decision. *E.g., Korniewjew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004). Here the BIA "agreed" with the IJ that Weng was not credible but, instead of adopting the IJ's decision, provided different reasons. To the extent Weng aims his arguments at the IJ's decision, which is admittedly problematic,[3] they will not be discussed.

Weng argues that the BIA's reasons for discrediting him do not relate to discrepancies that are material to his central claim—that he will be forcibly sterilized, and possibly beaten, if returned to China. *See Uwase v. Ashcroft*, 349 F.3d 1039, 1043 (7th Cir. 2003). Weng first takes issue with the BIA resting its

---

[2]In his opening brief, Weng incorrectly represents that these documents are part of the administrative record.

[3]The IJ's opinion is not very well reasoned. For example, the IJ relied on inconsistencies that were immaterial, and in some cases, nonexistent, as in his finding Weng's hearing testimony that his father was a fisherman inconsistent with earlier statements that his father worked on a boat. The IJ also injected his personal opinions into the hearing; for example, he concluded that an IUD cannot be accidentally displaced without explaining the basis of his knowledge. He also essentially accused the Chinese government of surreptitiously supporting the illegal migration of Chinese nationals because of the "money that is sent back to China through the Chinese diaspora."

credibility determination on his failure to mention in his initial interview, affidavit and hearing testimony his escape from five government officials who had come to arrest and forcibly sterilize him. Weng asserts that this omission "does not alter that fact that [his] wife was forced to have an abortion and an IUD inserted against her will" and "does not alter the fact that authorities attempted to sterilize Weng against his will." Similarly, Weng states that his failure to repeat in his asylum application and hearing testimony his assertion that officials intended to sterilize his wife is a minor inconsistency that "does not alter" his claim. Here Weng relies mainly on assertions of fact rather than legal arguments in challenging the BIA's reasoning. These assertions, however, do little to undermine the adverse credibility determination because this court will not supersede the BIA's factfinding simply because an alternative finding could also be supported by substantial evidence. *Krouchevski*, 344 F.3d at 673.

More importantly, the first two omissions cited by the BIA are not, as Weng contends, minor inconsistencies unrelated to the heart of the claim. With respect to the first omission, it is reasonable to expect an asylum applicant to describe the most invasive or severe events when asked to discuss mistreatment. *See Capric*, 355 F.3d at 1090; *Pop v. INS*, 270 F.3d 527, 532 (7th Cir. 2001). A contentious encounter with five officials who attempted to haul him off to be sterilized would be highly relevant to Weng's claim that he has a well-founded fear of persecution—namely, forcible sterilization—in China. But he failed to mention it in his initial interview, affidavit, and hearing testimony. Likewise, Weng failed to discuss in his affidavit and hearing testimony his earlier allegation that family planning officials intended to sterilize his wife—a detail that would be probative of his claim that the couple was targeted by family planning officials. These omissions bear on Weng's credibility. *See Korniejew,* 371 F.3d at 384 (upholding adverse credibility determination where applicant did not discuss in hearing testimony earlier statement that she had been kidnaped and held overnight); *Oforji v. Ashcroft*, 354 F.3d 609, 614 (7th Cir. 2003) (upholding adverse credibility determination where applicant stated in hearing testimony, but not in earlier proceedings, that her husband had been arrested and killed for political reasons); *Pop,* 270 F.3d at 532 (upholding adverse credibility determination where applicant omitted from two asylum applications claim that she was beaten and her home raided).

Weng also contends that the BIA's conclusion that he testified inconsistently about his wife's forced IUD insertions is erroneous because the BIA mistakenly stated that he had not mentioned these incidents in his initial interview. It is true that Weng mentioned in his asylum interview that his wife "had an IUD," although he did not claim that one had been forcibly inserted. And, as the BIA correctly stated, Weng did not mention his wife's IUD at all during his credible-fear assessment. Weng focused on his fear of sterilization in both of these interviews.

This court has noted that the addition of new factual claims that were not originally set forth can be viewed as evidence that an applicant is not a reliable and truthful witness. *Oforji,* 354 F.3d at 614. Particularly when viewed in the context of the record as a whole, *see Elias-Zacarias*, 502 U.S. at 481, Weng's sporadic discussion of the alleged forcible IUD insertions detracts from his credibility.

Finally, Weng asserts that he established eligibility for relief under the Convention Against Torture because returning emigres are routinely imprisoned and fined in China. Weng's argument is too conclusory to merit attention, and in any event he did not present it in his brief to the BIA, so it is waived. *See Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005).

Because substantial evidence supports the BIA's decision, we DENY Weng's petition for review.